## McLAUGHLIN *et al.* v. WHEELER *et al.*

1. The effect of giving an undertaking under Sections 5009, 5010, Comp. Laws, is to discharge the attachment, and defendant cannot thereafter maintain a motion to discharge under Section 5011.

2. Where, in his complaint, plaintiff alleges indebtedness as a substantive fact, instead of averring the facts out of which the indebtedness grew, as a conclusion, defendant may treat it as an alleged fact, and so deny it in his answer.

3. Incompetent evidence, relative to the issue being tried, if admitted without objection in any form, becomes competent for the purposes of the case.

4. Where between principal and agent parol evidence is offered to prove the authority of such agent, which by statute is required to be in writing, and such parol evidence is admitted without objection, and upon motion for new trial the probative force of such parol evidence is not questioned on account of its character, the question of its competency cannot be raised for the first time on the hearing of the appeal.

5. But the employment of an agent to find a purchaser for real estate need not be in writing.

6. A subsequent written instruction to an agent does not supersede or extinguish a prior parol instruction, which it is evident the written instruction was not intended to interfere with or displace.

7. An agent's authority may rest partly in parol and partly in writing, and when the parol evidence is conflicting, or the written instructions ambiguous, it is for the jury, under proper instructions, to find the scope and extent of the agent's authority.

8. Authority conferred upon a partnership may be exercised by either member of the firm. The rule prevailing in cases of power conferred jointly upon two or more persons does not apply to the case of a partnership.

9. In this case the terms of payment, as directed by principal to agent, were, "one-third May 15th, one-third June 15th, and one-third July 15th;" and it was not a substantial departure from such instruction that the agreement, after fixing the times of payment as above, further provided: "If any of said payments shall remain due and unpaid for three days after the time hereinbefore specified when the same shall be payable, that then, and in such case, it shall be at the option of the said parties of the first part [the principals and sellers] to declare this contract at an end and forfeited, and to refuse to complete the same." Such provision was clearly in the interest of the vendor, and was nearly equivalent to making time the essence of the contract, of which he could not complain.

10. Where from the evidence the jury may fairly infer, and do so find, that that it was the understanding between principal and agent that

payments should be made to the agent it is not a violation of the agent's authority, in the absence of instruction in that respect, to provide that such payments shall be made at a reasonable and proper place or bank convenient to him.

11. Where a principal employs an agent to find a purchaser for real estate, and nothing is said or understood between them as to the title, the implication of the law is, between principal and agent, as between owner and purchaser, that the owner has and intends to convey a good title; and it is no defense to the agent's claim for commission that the agent's agreement provided that the purchaser should get a good title, either in general terms, or that certain particular incumbrances should be removed; for,

12. The test of the agent's right to commission for finding a purchaser is not whether his agreement with the purchaser is specifically enforceable, but whether he has found a purchaser able, ready and willing to take the property on the terms prescribed by his principal.

13. A condition prescribed by the principal, of "one thousand dollars forfeit," is complied with by a deposit of that amount with the agent by the purchaser to be forfeited to the principal if the purchaser fails on his part to complete the purchase.

14. An agent is not necessarily incapacitated, by force of his agency, from acting as the custodian of an escrow between his principal and the purchaser, and the principal cannot complain in such case of such a provision.

15. *Held* that, in connection with the other testimony in the case, if not abstractly, the principal's instruction, "transferred on last payment," was ambiguous, in that it might refer either to title or to possession, and that it, with the other evidence upon the question of the agent's authority to fix the time when the purchaser should be let into possession, properly went to the jury.

(Syllabus by the Court. Argued April 26, 1890. Opinion filed Jan. 30, 1891.)

Appeal from district court Lawrence county. Hon. CHARLES M. THOMAS, Judge.

Action for services as attorneys and as agents for making sale of and finding a purchaser of certain property of defendants. Verdict and judgment for plaintiffs. Defendants appeal from the judgment, also from an order denying a new trial and from an order refusing to discharge an attachment made in the case. The judgment affirmed, the order continuing the attachment reversed.

The facts so far as material are stated in the opinion.

*VanCise & Wilson* and *W. E. Church*, for appellants.

The right to move for the dissolution of an attachment is

not prejudiced or lost by previously securing a discharge of the attached property by giving an undertaking. 2 Wait's Prac., 184; Garbutt v. Houff, 15 Abb. p. 189; Claflin v. Baere 57 How. Pr. 80; Rowels v. Hoare, 61 Barb. 266; Noyes v. Canada, 30 Fed. 665.

If any power was conferred by defendants to execute for them or either of them a contract for the sale of this property, it was upon McLaughlin and Steele and not upon William R. Steele. Where a private power is conferred upon two jointly, it cannot be exercised by one alone. Story on Agency, § 42; Ewell's Evans on Agency, p. 43; Copeland v. Ins. Co., 6 Pick. 198; Salisbury v. Brisbane, 61 N. Y. 617; Johnston v. Bingham, 9 Watts & S. 56; Downing v. Rugar, 21 Wend. 178. No authority from the defendant, Goodkind, to plaintiffs to make such a contract is shown. Both defendants must join to confer such an authority. Dillon v. Brown, 11 Gray 180; Blood v. Goodrich, 9 Wend. 75. A mere general authority to sell or find a purchaser at a price named does not include authority to convey or contract for a conveyance. Duffy v. Hobson, 40 Cal. 241; Milen v. Hobb, 14 At. 646; Morris v. Ruddy, 20 N. J. Eq. 236; Armstrong v. Lowe, 18 Pac. 758.

The authority conferred upon an agent to make a contract for the sale of real estate must be pursued with the utmost strictness. When conferred in writing, the authority is defined and limited by the writing and the writing is the sole evidence of the authority. Hayes v. Stone, 7 Hill 128; Sayre v. Wilson, 5 So. 158; Milne v. Kleb. 14 At. 646; Bissel v. Terry, 69 Ill. 184; Martin v. Farnsworth, 49 N. Y. 555; Hoyt v. Shepherd, 70 Ill. 309; Jackson v. Badger, 26 N. W. 908; Siebold v. Davis, 25 N. W. 778; Hampton v. Morehead, 17 N. W. 202; Wilson v. Wilson, 26 Pa. St. 393; Blum v. Robertson, 24 Cal. 128; Eliason v. Henshaw, 4 Wheat, 225; Yates v. Yates, 380, 821; Ames v. Bank, 103 Mass. 326; Retscherd v. Bank, 47 Mo. 181; Kimberly v. Henderson, 29 Md. 512.

The contract executed by Steele violated the only authority conferred in numerous essential particulars, any or all of which rendered it voidable by defendants. (1) It provided a place of

payment other than the residence or place of business of the defendants. Baker v. Holt, 14 N. W. 8; Iron Co. v. Meade, 21 Wis. 480; Sawyer v. Brossart, 25 N. W. 876; Laugellier v. Schaefer, 31 N. W. 690; Gilbert v. Buxton, 32 N. W. 364. (2) It withheld from the defendants the $1,000 forfeit until such time as they should execute and place in escrow with Steele a deed of the property. Farnsworth v. Hemmer, 1 Allen 494; Walker v. Osgood, 98 Mass. 348; Everhart v. Seale, 71 Pa. 256; Meyer v. Hanchett, 43 Wis. 246; Corman v. Beach, 63 N. Y. 97. (3) It obligated defendants to convey the interest of one Hattenback in the property and to secure the execution by him of deeds therefor. Holbrook v. McCarthy, 61 Cal. 216; Thomas v. Joslyn, 15 N. W. 675. (4) It obligated defendants to pay off and discharge a mortgage upon the property. Lathrop v. Atwood, 21 Conn. 116; Stout v. Folger, 34 Ia. 73; Miliani v. Tognini, 7 Pac. 279; Taylor v. Flickenstein, 30 Fed. 99; Shamp v. Meyer, 29 N. W. 379. (5) It provided for the immediate delivery of possession when the authority provided for transfer on last payment. Suffern v. Townsend, 9 Johns 35; Cooper v. Stower, Id. 331; Erwin v. Olmstead, 7 Cow. 229; Kellogg v. Kellogg, 6 Barb. 116.

One employed to make a contract of sale earns his commission only when he has effected a contract binding upon both parties. Sibbald v. Iron Co., 83 N. Y. 378; Frazer v. Wykoff, 63 N. Y. 445; McGavock v. Woodlief 20 How. 221; Coleman's Ex'r's v. Meade, 13 Bush. 358; Drewry v. Newman, 99 Mass. 256; Bradford v. Menard, 28 N. W. 248.

The question whether Steele acted in the due execution of an authority was one of law for the court and the material facts being undisputed left nothing to be submitted to the jury. 2 Pars. Con. 492; Levy v. Godsby, 3 Cranch 180; U. S. v Hodge, 6 How. 279; Falls W. M. Co. v. Broderick 12 Mo. App. 378; Railroad v. Bates, 11 At. 705; Glenn v. Savage, 13 Pac. 448; Aufmordt v. Stearns, 46 Conn. 411; Welsh v. Dusar, 3 Bin. 328; Dennison v. Wertz, 7 S. & R. 375; Luckhart v. Odgen, 30 Cal. 548; Ronney v. Gere, 5 Wis. 62; Goddard v. Foster, 17 Wall 123.

*McLaughlin & Steele*, for respondents.

While the New York courts have held that the giving of an undertaking to discharge an attachment does not prejudice the right to subsequently move to discharge the same, their decisions are sustained neither by reason nor the weight of authority.    Payne v. Snell, 3 Mo. 409; Dierolf v. Winterfield, 24 Wis. 143; Paddock v. Mathews, 3 Mich. 18; Endress v. East, 18 Kan. 236; Cory v. Lewis, 5 N. J. L. 976; Vreeland v. Brown, 21 N. J. L. 229; Schuyler v. Sylvester, 28 N. J. L. 488; Austin v. Burget, 10 Ia. 302.

The defendants failed to plead the defense, that plaintiffs had exceeded the authority conferred upon them, and that question cannot be considered by this court.    Such an issue can only be raised by plea in the nature of a plea of confession and avoidance.    Higgins v. Germain, 1 Mon. 233; Alemany v. Petaluma, 38 Cal. 557; McKyring v. Bull, 16 N. Y. 307; Brown v. Eaton, 21 Minn. 410.

The entire testimony as to the parol authority from defendants to plaintiffs was received in evidence without objection or exception; so that even if incompetent no advantage can be taken of that fact by appellants in this court.    Leone v. Russell, 42 N. Y. 255; Territory v. Keyes, 5 Dak. 249; Noonan v. Caledonia Co. 121 U. S. 393; U. S. v. McMasters, 4 Wall. 690; Burton v. Diggs, 20 Wall. 125; Wood v. Weimer, 104 U. S. 786; Beck v. Meagher, 104 U. S. 289; Beckman v. Frost, 9 Am. Dec. 246; Apperson v. Cottrill, 26 Id. 239; Barrett v. Wells, 26 Id. 315; Sassar v. Walker, 25 Id. 275; Judd v. O'Brien, 21 N. Y. 186; Stuart v. Smith, 14 Abb. 75; Van Deusen v. Ins. Co., 1 Abb. N. S. 349; Emerson v. Booth, 51 Barb. 40.    An objection to testimony must be accompanied with a statement of the grounds upon which it is based.    Fountain v. Pettee, 38 N. Y. 84; Maddett v. White, 12 N. Y. 442; Bank v. Warden, 6 N. Y. 19; Coppertwaite v. Sheffield, 3 N. Y. 243; Payne v. Treadway, 16 Cal. 248; Kiler v. Kimball, 10 Cal. 367; Franklin v. Updegraff, 43 Pa. 358; Newton v. Harris, 6 N. Y. 345; Durgin v. Ireland, 14 N. Y. 322; Blossom v. Barrett, 37 N. H. 434.    But this testimony as to the parol authority was competent as showing the

relations of the parties, and the entire authority was not contained in the letters and telegrams.   Sayre v. Wilson, 5 So. 161; Fisk v. Henarie, 9 Pac. 329; Story on Agency, § 79.

Appellants not having raised the question of the want of authority from the defendant Goodkind in the trial court, cannot do so here.   Hayne on New Trial and App. § 16; Mateer v. Brown, 1 Cal. 222; People v. Banvard, 27 Cal. 474; Gardiner v. Schmaelzle, 47 Cal. 590; Sanchez v. Neary, 41 Cal. 487.

The authority to contract for sale in this case was conferred upon the plaintiffs as a partnership.   Steele as a partner could exercise it alone.   Mechem on Agency, § 65; Eggleston v. Boardman, 37 Mich. 14; Deakin v. Underwood, 33 N. W. 318. The authority was conferred upon plaintiffs in letters and telegrams and by parol, and is to be more liberally construed than if conferred by more formal and deliberate instruments.   Story on Agency, §§ 75–82; Lyon v, Pollock, 99 U. S. 673; Hopwood v. Corwin, 18 N. W. 912; Fogarty v. Sawyer, 17 Cal. 591.

When plaintiffs had found a purchaser able, ready and willing to complete the purchase, they had performed their duty and their commission was earned.   Middleton v. Friedla, 25 Cal. 77; Buckingham v. Harris, 10 Cal. 458; Glenworth v. Luther, 21 Barb. 146; Blood v. Shannon, 29 Cal. 393; Koch v. Emmerling, 22 How. 73; Doty v. Miller, 43 Barb. 529; Barnard v. Monnott, 3 Keyes 203; Watson v. Brooks, 8 Sawyer 319; Knapp v. Wallace, 41 N. Y. 479; Neilson v. Lee, 60 Cal. 563; Parker v. Walker, 8 S. W. 390; Duclos v. Cunningham, 6 N. E. 790; Phelan v. Gardner, 43 Cal. 306; Cooke v. Fiske, 12 Gray 493; Sibbold v. Iron Co., 83 N. Y. 383; Hamlin v. Schulte, 27 N. W. 302; Monroe v. Snow, 23 N. W. 402.

Under the authority conferred plaintiffs had a right to give a contract for sale binding defendants to give a deed with covenants of general warranty and also to agree where and in what contingency the purchaser should be let into possession. Birmingham Land & Loan Co. v. Thompson, 5 So. 474; Civil Code §§ 988, 989, 1363; LeRoy v. Beard, 8 How. 467; Vanada v. Hopkins, 19 Am. Dec. 98; Very v. Levy, 13 How. 356; Valentine v. Piper, 22 Pick. 92; Pringle v. Spaulding, 53 Barb. 20; Mechem on

Agency, §§ 305, 311; Owings v. Hull, 9 Pet. 609; Deakin v. Underwood, 33 N. W. 319; Rutenbery v. Main, 47 Cal. 214.

Kellam, J.  At the times referred to in the proceedings in this action, the plaintiffs, now respondents, composed a firm of practicing attorneys in the city of Deadwood, and the defendants, appellants here, were partners in business in the city of Chicago.  The complaint states two distinct causes of action against defendants—the first for services as attorneys at law, and the second for services as agents of defendants in making sale of and finding a purchaser for certain mining and other property of defendants in the vicinity of the said city of Deadwood; both of which causes of action were denied by defendants.  The case was tried before a jury.

At the close of the testimony defendants moved the court to direct a verdict in their favor on the second cause of action, which was refused.  The jury found for the plaintiffs on both causes of action, and a motion for a new trial was denied. Prior to the commencement of the action, a warrant of attachment against the property of the defendants was issued on the ground of the non-residence of defendants.  Afterwards defendants moved to discharge this attachment, on the ground that personal service of the summons was not made, nor publication thereof commenced, within thirty days after the issuing of the summons, as required by Section 4993, Comp. Laws, which motion was overruled.  The case comes to this court upon appeal from the judgment the order denying a new trial, and the order refusing to discharge the attachment.  Defendants, however, make no contention as to the first cause of action stated in the complaint.

We will first consider the questions involved in the motion to discharge the attachment.  Prior to this motion defendants had given a satisfactory undertaking for the payment to the plaintiffs of any judgment that might be recovered against them in the action, and the attachment had been discharged upon such undertaking, as provided in Sections 5009, 5010, Comp. Laws; and respondents claim that appellants could not thereafter maintain a motion to discharge, for the reasons that,

by giving such undertaking, appellants had fully recognized the validity of the attachment; and that, having already obtained a discharge of the attachment under said Sections 5009 and 5010, there was no longer any attachment to be discharged.

Upon this precise question the highest courts of different states, under statutes substantially like ours, have reached opposite conclusions; and, as either view is thus supported, it will probably be as satisfactory simply to recognize the fact of the conflict, without attempting to array and compare authorities, and, as the question is an open one in this state, now adopt the rule of practice in respect thereto which seems to us most logical and reasonable under the different provisions of the attachment law. Section 5009 provides that "whenever the defendant shall have appeared in such action he may apply to the clerk who issued the attachment, or to the court for the discharge of the same," etc.; and the succeeding section provides that such discharge may be accomplished by giving an undertaking, as was done in this case. Does this proceeding actually extinguish the attachment, or simply release the property from its grasp? The next section (5011) provides that, on motion of defendant, the attachment may be discharged upon the merits, and prescribes the practice. The effect of giving the undertaking as in Section 5010, and a successful motion by defendant as in Section 5011, is described in precisely the same language; and only under the coercion of a strong necessity would this court feel justified in saying that in one section the expression "discharge of the attachment" meant simply a release of the property attached, and in the next section the same expression meant the destruction of the warrant. No such necessity is apparent. If defendant only seeks a release of his property, he may accomplish that under Section 4997. If he desires the discharge of the attachment, he may have his election to proceed under Sections 5009 and 5010, and give an undertaking, or make his application upon affidavits under Section 5011; but, having procured its discharge by the first method, there is nothing left to proceed against by motion. This identical question has recently been before the supreme court of North Da-

kota, under the same statute inherited from the Territory of
Dakota, and, after elaborate and instructive discussion, the
same conclusion is announced. Fox v. Mackenzie, ante, 386.
The same effect is given to similar statutory provisions in En-
dress v. Ent, 18 Kan. 236; Dierolf v. Winterfield, 24 Wis. 143;
Austin v. Burgett, 10 Iowa 302; Ferguson v. Glidewell, 48 Ark.
195, 2 S. W. Rep. 711. These views necessitate the conclusion
that the court below ought not to have entertained the motion
to discharge, and so much of the order appealed from as pro-
vides "that said writ of attachment stand and continue in full
force" is reversed, for the reason, as indicated, that the same
had already been discharged by giving the undertaking.

The second cause of action, the only one involved in this
contention, is an alleged indebtedness of defendants to plain-
tiffs "for the work, labor, and services of the said plaintiffs
performed and bestowed as the agents of and for the said de-
fendants, and on their retainer, in making sale of and finding a
purchaser for certain mining and other property of said de-
fendants, situate," etc. The answer of defendants was sub-
jected to some criticism by appellants, and an effort was made
to limit and qualify the issue apparently raised by it; but we
are disposed to treat it as a general denial of the cause of ac-
tion. The complaint alleges that defendants "are indebted to
the said plaintiffs for the work, labor, and services," etc.; and
the answer denies "that they, or either of them, are indebted
to the said plaintiffs, or either of them, for work, labor, and
services," etc. If plaintiffs had pleaded the facts out of which
the indebtedness resulted as a conclusion, a denial of such con-
clusion would have been insufficient to make an issue, but, hav-
ing alleged the indebtedness as a fact, we think the defendants
might so treat and so deny it in their answer. The substantial
allegation of the complaint is that "defendants are indebted,"
and, if the answer had been in terms a general denial, it would
have simply denied the indebtedness, and tendered the same
issue as this answer does. Morrow v. Cougan, 3 Abb. Pr. 328;
Quin v. Lloyd, 41 N. Y. 349.

The assignments of error are very numerous, but we think

they may be all fairly considered in the discussion of two or three general questions into which the entire contention naturally divides itself. Does the evidence show any employment of plaintiffs by defendants of the nature indicated in the complaint? If so, what was plaintiff's authority under such employment, and did they pursue such employment and execute such authority in a manner to entitle them to the compensation which was to be the reward therefor, if such reward was agreed upon?

It appears that in 1884 the defendants had become the owners, conjointly with one Nathan Hattenbach, of these mining properties—out of the alleged contract for the sale of which this controversy grows—except the smelter, which was erected later; that by subsequent deeds of conveyance, absolute upon their face, they had become and were, in 1886, the apparent legal owners of all of said properties included in the alleged contract for sale, subject, as is claimed by defendants, to an equitable interest of said Hattenbach, fully known to and understood by said plaintiffs, prior to and at the time of the making of the alleged contract; that as early as in December, 1884, the parties had several conversations in reference to a sale of these properties by plaintiffs for defendants, but as to the tenor of these conversations, and what agreement, if any, was reached, the testimony is conflicting. Nothing tangible was effected towards making a sale until the spring of 1886, at which time, April, 1886, plaintiffs claim they found a purchaser, and negotiated a sale upon terms authorized by defendants.

The first discussion of counsel is as to the necessity for written authority to an agent to contract for the sale of real estate, and several sections of the Compiled Laws (3245, 3544, 3617, and 3971) are referred to by defendants' counsel as rendering incompetent all testimony tending to show an oral authorization. These several sections provide that real estate can only be transferred—if by act of the parties—by an instrument in writing, subscribed by the grantor, or by his agent thereunto authorized by writing; that an agreement for the sale of real estate, if made by an agent, is invalid unless the agent's

authority be in writing, and subscribed by his principal; that no, agreement for the sale of real estate is valid unless some note or memorandum thereof be in writing, subscribed by the party to be charged, or by his agent thereunto authorized in writing, and that oral authorization of an agent is sufficient for any purpose, except that an authority to enter into a contract required by law to be in writing can only be given by an instrument in writing. If defendants' claims were confessedly correct, that the effect of these sections is to establish a rule of evidence not only between the contracting parties in such transaction, but between principal and agent as well, we doubt if it would be available to them upon this record; for no objection appears to any part of the evidence tending to show the parol authority of plaintiffs as the agents of defendants. The general rule is too well established to be debatable that incompetent testimony, if relevant to the issue being tried, admitted without objection, becomes competent for the purposes of the case. Warder v. Ingli, 1 S. D. 155; 46 N. W. Rep. 181. The fact that the evidence is made incompetent by statute would not, we think, defeat the application of the rule, where the party who might claim protection under it chooses thus to waive his right. It is not the case of a contract declared by statute to be illegal and void, but rather one which can only be proved by written evidence. For such purpose parol evidence is incompetent, but its incompetency may be waived by the party against whom it is sought to be used, and acquiescence in its admission upon the trial, without objetion in any form, would generally constitute such waiver. In Livermore v. Stine, 43 Cal. 274, it was held that a contract, which was itself invalid under the statute of frauds unless in writing, might still be proved by parol if such manner of proof were unobjected to, and that a motion to strike out such parol testimony at a subsequent stage of the trial was properly overruled; and again in Sweetland v. Shattuck, 66 Cal. 31, 4 Pac. Rep. 885, the same conclusion was declared as to the effect of unchallenged parol evidence as proof of a contract required by law to be in writing.

We cannot see how the record of this case, which precedes the motion for a new trial, can be held to present any question to this court upon the point stated and argued, for the reason that no such question was presented to or passed upon by the court below. It is the duty of the appellate court to review "errors in law occurring at the trial." Errors in law are errors in rulings made by the trial court upon questions presented during the trial, but, if no question is presented, the court makes no ruling, and consequently no error. It certainly cannot be held error for the court to admit evidence if the party against whom it tends indicates his willingness to have it admitted, and he does so by failing to object. Nor was this question of the incompetency of oral testimony to prove the agency raised by defendants on their motion for new trial. While one of the grounds was the insufficiency of the evidence to justify the verdict, the insufficiency designated and relied upon was as to the *quantum* of evidence, and not its character. Neither during the trial, nor upon the motion for a new trial, was the parol evidence challenged as incompetent, and such objection cannot be presented originally on appeal. It is in effect asking this court to take cognizance of an defense interposed for the first time upon the hearing of the appeal. This should not be done. Hastings v. Railway Co., 6 N. Y. Supp. 836; Sweetland v. Shattuck, *supra.*

But upon its merits, defendants' objection to this testimony is not tenable. We are clearly of the opinion that parol evidence tending to show an employment of plaintiffs by defendants to find a purchaser for their properties, as distinguished from authority to complete a sale by making a conveyance, was admissible and properly before the jury upon that issue. Section 3971, Comp. Laws: Real Estate Exch. v. Stephens, (Mich.) 38 N. W. Rep. 685. From this original employment springs plaintiffs' alleged cause of action. Having found a possible purchaser at defendants' price, more specific instructions as to details of terms were desired and given, and of course were binding upon plaintiffs; but they were built upon and attached to the authority and agreement under which

plaintiffs were already acting; and so plaintiffs claim, and the evidence tends to show, that their original authority to represent defendants rested upon an oral agreement, and that the relation of principal and agent, having been so established, the letters and telegrams introduced in evidence, and hereinafter considered, were an outgrowth of that relation, and in some respects a modification of their authority. The defendants contend that under Section 3545, Comp. Laws, providing "that the execution of a contract in writing, whether the law requires it to be in writing or not, supercedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument," all the precedent oral stipulations between the parties became merged and lost in the subsequent written instructions, to-wit, the letters and telegrams, and that consequently, plaintiffs' authority must be found alone in such written instructions. This is undoubtedly true to the extent to which the writing is intended to cover the same ground as the oral stipulations, but a subsequent writing does not extinguish a prior independent oral stipulation, for which it is evident no part of the writing was intended as a substitute. If the evidence showed an authority from defendants to sell for $20,000, upon a commission of ten per cent., a subsequent written instruction to sell only for $30,000, nothing being said as to commission, would not extinguish the former stipulation as to commission, or require a new agreement in that respect. Sayre v. Wilson, 86 Ala. 151, 5 South. Rep. 157,

To the extent that a subsequent written is inconsistent with a former parol agreement, or is evidently intended to displace it, whether consistent or not, the latter must yield to the former, but no further; and so an agreement or the authority of an agent may rest partly in writing and partly in parol, and the evidence impresses us that this is such a case. But, whatever the original authority of plaintiffs may have been, it must be held to be controlled by such subsequent instructions from defendants as were received by plaintiffs prior to their execution of such authority. Assuming that the evidence shows, as we think it does, that plaintiffs were orally authorized to find a

purchaser for these properties at a minimum price of $20,000, it becomes necessary to ascertain in what respect and to what extent this authority was modified or changed by subsequent instructions.

These properties consisted of several distinct claims or parcels, and on April 12,.1886, plaintiffs telegraphed defendant Wheeler for price at which he would sell his interest in Adelphi, (one of these claims,) saying they had an offer of $3,000 cash, to which defendant Wheeler replied by wire, "Will answer particulars by mail." The written answer referred to was received by plaintiffs on the 16th, and was so far as pertinent to this inquiry, as follows: "Your telegram to hand. In answer to the same, would say to you, in confidence, that at present we are considering now with N. Y. parties, who you may probably know, for the sale of all our interest in the carbonate camp. This includes smelter and machinery, water right, Katie and Arthur lode, one-fourth interest in Adelphi, three-eighths interest in La Plata, one sixth in Cashier, one limestone claim, —total $30,000. We shall hear from them as soon as their manager comes back. He does not live in this city. We have no doubt the sale will be made, as he told me before he left. However, if you can make a sale before us, first come first served, but don't take less than one thousand dollars on the bond. We shall not divide any of those interests. They have got to go all or none." April 18th plaintiffs received the following latter, dated 14th: "On yesterday I received a notice from Mr. Hattenbach that he had an offer for the Adelphi $4,500. Not knowing much about this claim. I advised him to sell. Consequently, if you could make a sale for the balance, would reduce price that much. Respectfully M. WHEELER. Provided he has effected said sale." April 19th plaintiffs sent the following telegram: "M. Wheeler: Can sell at price in letter; one thousand forfeit; three payments,— two, three, and four months. Shall we close and sign bond for you, or will send bond in name of William R. Steele? Hattenbach has not completed sale." And on the same day plaintiffs sent this letter: "M. Wheeler. Dear Sir—Your two letters duly re-

·ceived, and think we shall be able to make sale of all the interests named at thirty thousand dollars, as two parties are negotiating, and we shall follow your directions of first come, first served, and may possibly send you a telegram during the day. * * * You do not say what time shall be given, nor whether we shall sign bond for you, if forfeit of one thousand dollars is put up. Please advise us fully; and if you send any power of attorney, or make any deed to us in trust, have it made in the name of William R. Steele." On the same day plaintiffs sent the further letter: "M. Wheeler, Chicago. Dear sir, Since writing you this morning, parties have offered to take all the properties, as specified in your letter of 12th inst., at your price, thirty thousand dollars, in three equal payments, at two, three, and four mouths, and put up a forfeit of one thousand dollars to complete contract and payment. The parties are responsible, and we have no doubt will make payments as per agreement. * * * We have just telegraphed you substance of offer. You can send deed or bond in name of William R. Steele, (Judge McLaughlin is absent from home,) and we will deed or bond to such parties as purchasers desire; or you can send us power of attorney to act for yourself and Mr. Goodkind in the matter, and we will attend to the details for you, and see that your interests are protected. Have advised with Mr. Nathan Hattenbach in the matter. He has not completed sale of La Plata interest, and we have advised him not to do so, but to make a clean sale of all at once. Shall endeavor in sale to obtain payment of amount due for smelting, and obtain settlement of all pending claims." It is conceded that the La Plata was the claim referred to in defendant Wheeler's letter of the 14th as the subject of prospective sale by Hattenbach, and was by mistake called the Adelphi in that letter. April 21st plaintiffs received the following telegram from defendants: "Chicago, April 20, 1886. McLaughlin & Steele: You can sign for us under conditions as follows: One thousand forfeiture; one-third May 15th; one-third June 15th; one-third July 15th. Transferred on last payment. Answer, if accepted. M. Wheeler & Co." To which, on the same day, plaintiffs re-

plied by telegraph as follows: "Your terms accepted. Deal closed."

Upon the oral testimony hereinbefore and hereinafter referred to, and these letters and telegrams, must be determined the scope and extent of plaintiff's authority in the premises. The original authorization was to find a purchaser at $20,000. This employment, as before stated, was not required to be in writing, and the relation of principal and agent might, in that respect, be established by parol evidence, and the agent show himself entitled to compensation, if he had found a qualified purchaser ready and willing to take the property upon the terms imposed by the principal even though the principal had never affirmatively or incidentally in writing recognized the agent's authority. That authority, neither by our statute, nor the decisions of the courts generally, is required to be in writing. The authority which must be written is the authority to enter into and bind the principal by a written contract.

The first evidence of any employment of plaintiffs in regard to the disposition of this property is that of the plaintiffs themselves, both testifying that the employment was to find a purchaser at $20,000, and for this, if successful, they were to receive a commission of ten per cent. Subsequently, by written directions of defendants, the price was changed to $30,000, but no change was made as to commissions. This commission, fixed by the parties, was for a specified service, to-wit, finding a purchaser. The oral authorization was general, and no terms in detail were prescribed by defendants, but afterwards, plaintiffs having found a possible purchaser in the person of Bullock, notified defendants, who then gave plaintiffs the specific terms upon which they would sell. This action is for the recovery of the ten per cent. so fixed upon as the compensation plaintiffs were to receive for finding a purchaser as above; and the real controversy here is not whether plaintiffs have shown sufficient authority to execute a contract binding upon their principals, but whether the purchaser they found was such a purchaser as they were employed to find; and the test of this is, were the terms upon which Bullock agreed to take the prop-

erty terms upon which defendants indicated their willingness to sell? and this will be the subject of later discussion.

But defendants contend that whatever authority, if any, plaintiffs, or either of them, had under the letters and telegrams, it did not proceed from or bind defendant Goodkind. It is a noticeable fact that these several letters and telegrams, except the telegram of April 19th received by plaintiffs April 20th, were signed "M. Wheeler;" but it is also significant that all of plaintiffs' inquiries to which these were responses were addressed to "M. Wheeler," but all were in relation to property owned by Wheeler & Goodkind jointly, concerning the sale of which plaintiffs' original oral authorization came from both, as testified to by both of said plaintiffs; and there is no contradiction of this so far as Goodkind is concerned, and the final telegram of April 19th, signed, "M. Wheeler & Co.," which was plainly a continuation of the correspondence, is to us entirely inconsistent with the thought that Wheeler's interest only was being represented. It is in evidence that defendants were partners in business under the firm name of "M. Wheeler & Co.;" and, while it does not appear that this was partnership property, we think the evidence tending to show authority from Goodkind was sufficient to go to the jury upon that issue.   The letter of April 29th, signed by both defendants, repudiated the contract, because "different in many respects from any contract we have authorized you to make."   Mr. Goodkind here joins Mr. Wheeler in repudiation, upon a common ground, not that he has given no authority, but that the contract is not in pursuance of the authority we have conferred, The telegram of April 20th, covering the definite terms upon which sale might be made, was signed, "M. Wheeler & Co;" and we think the subsequent letter of the 29th, admitted without objection, might well have been considered by the jury as tending to explain who were meant by "M. Wheeler & Co.," and as tending to recognition by Goodkind as binding upon himself of the authority previously given in form by "M. Wheeler" and "Wheeler & Co."

Defendants make the further objection that, if any authority at all was conferred, it was upon the firm of McLaughlin & Steele, and not upon William R. Steele who purported to exercise it. Plaintiffs composed a partnership, as was alleged and proved, and authority to the firm might be exercised by either member. The authority conferred was not a power to be exercised jointly by the two persons composing the firm, and the rule prevailing in cases of power conferred jointly does not apply to the case of a partnership. Nor is it important that in the execution of the contract it was formally signed in the name of the principals, "By William R. Steele, Agent," instead of "By McLaughlin & Steele, Agents." The material question is, was the firm authorized to make and sign the contract for their principals? If so, it would have been well executed by simply signing the principals' names by either partner, and no more. It neither helped nor hurt such execution in its legal effect to add the name of the firm, or either of its members. Deakin v. Underwood, 37 Minn. 98, 33 N. W. Rep. 318; Berkey v. Judd, 22 Minn. 287.

As indicated by our discussion of the questions already considered, we think the trial court was right in declining to disturb the verdict of the jury, and to grant a new trial upon the question of plaintiffs' authority to find a purchaser for the property in question; and this, we think, was all plaintiffs were required to show, provided the purchaser thus found was able, ready and willing to take the property upon the terms prescribed by defendants. To determine this, we must compare the conditions of the alleged contract with the terms prescribed by defendants. Defendants' terms were: Price, $30,000; forfeiture, $1,000; payments, one-third May 15th, one-third June 15th, one-third July 15th, transferred on last payment. Defendants insist that their proposed terms of payment were substantially departed from, in that, after naming the specific dates fixed by defendants, there is the further provision that, "if any of said payments shall remain due and unpaid for three days after the time hereinbefore specified when the same shall be payable, that then, and in such case, it shall be at the option

of the said parties of the first part [defendants] to declare this contract at an end and forfeited, and to refuse to complete the same." Did this provision constitute such a departure from defendants' terms as will relieve them from liability to plaintiffs? We think not. The agreement itself no where makes time the essence of the contract, nor does it appear that plaintiffs were instructed by defendants, or required by their duty to defendants, to so make it. The provision was clearly in the interest of defendants. It was nearly the equivalent of making time the essence of the agreement, and we do not think defendants have any reason to complain of such a provision. As well might they complain that as a part and parcel of the transaction plaintiffs had collected the smelting claim in their favor, nor being particularly instructed to do so. The provision did not extend the time of any payment, but merely fixed the time at the expiration of which defendants might declare the contract forfeited for default in payment, and fixed a shorter time than under any circumstances would be allowed, if left to the determination of a court as a reasonable time.

It is further objected that it was beyond the authority of plaintiffs to provide that the several payments should be made at the Merchants' National Bank in Deadwood, and the fact that it was so conditioned in the contract constitutes a defense to plaintiffs' second cause of action. The answer to this objection may have been found by the jury in the fact, for which there is at least some support in the evidence, that defendants had, in their original employment of plaintiffs, authorized them to collect the contract price in case of a sale, and that no subsequent instruction was inconsistent therewith. Referring to pages 36, 37, and 38 of the abstract, we find the following testimony from plaintiff Steele: "Question. Did you have any conversation with Mr. Wheeler or Mr. Goodkind, when they were here,—any conversation as to the application that was to be made of the money in case we sold the property for them? Answer. I did; yes, sir. Q. State what the conversations were. A. [The answer to this question then refers to an indebtedness of some $5,000 to Aaron and Joseph Hattenbach,

brothers of Nathan Hattenbach, which, together with other indebtedness, was secured by mortgage, given by the Hattenbach Smelting Company for a larger amount, running to defendants, The answer then proceeds:] The question had been discussed by Mr. Goodkind, Judge McLAUGHLIN, and myself, as to the *status* of the property, and their *status* as special partners, and what security they had under these mortgages, and growing out of that was the discussion of locating the two mining claims; that is, embracing the mill site and the smelter on the 1st day of January, 1885, when the previous mining locations that had existed there, would lapse by reason of failure to do the annual representation work. Mr. Goodkind came to the office some time in December, and some time before he went away, and said that he had concluded to have the mining claims located according to the suggestion, on the 1st day of January, 1885, I then said to Mr. Goodkind: "Well, Mr. Goodkind, in that case the mortgage on that property will be cut up by the roots, and Messrs. Aaron and Joseph Hattenbach will be left without any security, unless you make other provision for them.' Mr. Goodkind said that was all right; that they were all friends, and that Mr. Aaron and Joseph Hattenbach should be protected, and share and share with them; that if we could make a sale of the property, that we should collect the money, and pay what might be due us; then, if there was sufficient to pay in full Aaron and Joseph Hattenbach, and Wheeler & Goodkind, that Aaron and Joseph Hattenbach should be paid, and the remainder, whatever it might be, sent to Wheeler & Goodkind, and and they would adjust their matters with Mr. Nathan Hattenbach; and afterwards, on the 1st day of January, the claims now and afterwards known as the 'Arthur' and 'Katie' lodes were located." We think, the defendants having thus indicated their intention and purpose as to the collection and disposition of the proceeds in case of sale, the plaintiffs were justified, in the absence of modifying instructions, in providing that the payments might be made to them at such reasonable place as their convenience suggested. Such payments were

not to be made to, but at, the Merchants' National Bank, Dead-wood.

The evidence last quoted might also, in the judgment of the jury, explain and justify the action of plaintiffs in providing for a discharge of the Hattenbach mortgage. Defendants had fully advised plaintiffs of their purpose and desire with reference to this mortgage in case of sale. Plaintiffs should collect the money on the sale; pay themselves; "then, if there was sufficient to pay in full Aaron and Joseph Hattenbach, and Wheeler & Goodkind, that Aaron and Joseph Hattenbach should be paid, and the remainder, whatever it might be, sent to Wheeler & Goodkind, and they would adjust their matters with Mr. Nathan Hattenbach." Receiving no other or different instructions, plaintiffs might be warranted in understanding that it was still defendant's intention to have this mortgage paid and discharged from the purchase money; and that such was really their intention is evidenced by their letter of April 21st, received by plaintiffs, however, after the negotiations were closed, in which they say: "As regards the second payment, we have the matter overlooked by haste, and should say $5,000 should be the payment, as there is a mortgage of $15,000 which can be cleared up July 15th, when the transfer to take place as to the last payment, and then transferring the property, would save the parties three hundred dollars in interest. You can modify the second payment. However, if the contract should be made, you can use your own judgment for a change." But independent of this evidence and explanation, when defendants offered their property for sale they offered it with a good title. A good title means an unincumbered title, and if plaintiffs were authorized to negotiate a sale of this property at all. nothing being said or understood between them as to title, such authority extended to providing for an unincumbered title. But this will be discussed further on, in connection with a further objection to this contract.

Defendants also object to the terms agreed upon, because the contract "withheld from the defendants the $1,000 forfeit until such time as defendants should execute and place in escrow

with Steele a deed or deeds of the property." Defendants
named, as one of the conditions upon which they would sell,
that the purchaser should put up a forfeit of $1,000, or, as ex-
pressed in their letter of April 12th, "Don't take less than
$1,000 on the bond." The object of this was plainly to secure
the completion of the purchase by the purchaser, or, in case of
default, to compensate defendants for the disappointment; and
this money was paid upon the execution of the agreement, to
be held by plaintiffs until defendants' deed should be received.
This was entirely right, and in accordance with usual business
methods. It was in the hands of defendants' agents, available
to them, as part payment, as soon as they performed their part
of the contract, or as a forfeit, if the purchaser failed upon his
part. This was fully explained to them in plaintiffs' letter of
April 22d, which accompanied the agreement. "We enclose
copy of agreement, so that you may be advised fully of its
terms. The one thousand dollars has been paid us, which. as
you will see, we are to hold until the deed comes to us, when
we are to turn it over to you. The deed we are not to deliver
until all payments are made and stipulations complied with."
Defendants' counsel insists that Steele was not a competent
custodian of the escrow, as between these parties, and so pro-
viding was a plain violation of defendants' rights; but we think
he states the law too broadly upon this point. In Railroad Co.
v. Iliff, 13 Ohio St. 254, in concluding an elaborate discussion
of the competency of an agent as the custodian of an escrow,
the court says: "And I believe no case can be found, no opinion
of any jurist can be cited, to the effect that the agent of one
party is incapacitated from becoming the depositary of an
escrow; and, if we were to decide that such incapacity existed,
we should originate a distinction hitherto unknown to the
books."

The defendants make the further objection that the con-
tract obligated defendants to convey all the interests of Nathan
Hattenbach in the property, and to secure the execution by him
of deeds therefor. By their letter of April 15th defendants
had specifically described the property they desired to sell for

$30,000, and this was the property plaintiffs were to find a purchaser for. Nothing was said as to accepting any interest, equitable or otherwise, of Nathan Hattenbach or anybody else. Plaintiffs testify that while they knew that Hattenbach had indefinite equitable interest in this property, or some part of it, it was their understanding, derived from defendants themselves, that such interest would be adjusted between themselves after a sale should be made. Referring again to the testimony above quoted, we make this extract: "And the remainder [balance of purchase money], whatever it might be, sent to Wheeler & Goodkind, and they would adjust their matters with Mr. Nathan Hattenbach." On page 65, abstract, occurs this evidence of Plaintiff Steele: "And I understood from Messrs. Wheeler & Goodkind, both of them, and from Mr. Hattenbach, that there was an arrangement between them that, if Wheeler and Goodkind sold this property so as to pay off the debts of the company, discharge the mortgages; return the capital of the special partners Wheeler and Goodkind, and the special partnership of the Hattenbach Smelting Company, that if there should be a residue over and above, that Mr. Hattenbach, by some arrangement between himself and Wheeler and Goodkind, was to share in that surplus. What the arrangement was I never knew." Again on page 71, abstract, plaintiff Steele testifies: "The only interest of Mr. Hattenbach in the property was, as I understood from all of them, such share as they might give him in the surplus after the matter was closed up, and every one else had been paid." In partial corroboration of this is the testimony of defendant Wheeler, (page 84, abstract:) "The legal title of this was, in the month of April, the same as it was in the year when the special partnership was formed, only we held, in the month of April, Mr. Nathan Hattenbach's interest in trust for moneys advanced at different times for taxes and so on, for getting patents to the properties, and paying servant, and advancing some fees to attorneys, for to hold that property until it was sold, and take out from the sale the differences. Question. Was the entire legal title to the property that had been owned

by this company, in the month of April, 1886, in yourself and Mr. William Goodkind? Answer. As I said before, the property was transferred to us for money, to hold in trust, for money we advanced to the company. The sale was to be made to take out this money. The property was transferred in our name without our asking for it." Against this is the following testimony of defendant Wheeler, (page 93, abstract:) "Question. And did they [plaintiffs] fully know what interest Nathan Hattenbach had in this property? Answer. Yes. Q. At the time of making this pretended contract, did they know Mr. Nathan Hattenbach's interest in this property? A. Yes. Q. Did they know for what purpose you held, you and your partner, Mr. Goodkind, held the interest of Nathan Hattenbach in that property? A. I do not know if they did or not. I can't tell. Q. But they knew that Hattenbach was interested in the matter, and that his signature was required to to convey the property? A. Yes. "So far as this testimony is conflicting, if at all, it was for the jury and they have passed upon it.

But a conveyance from Hattenbach was only provided for "if the same shall be necessary to complete said title." When defendants offered this property for sale through the agency of plaintiffs, and plaintiffs had found a purchaser upon their terms, they were bound in duty to such agents to be ready to convey by a good title, unless, under the evidence, plaintiffs were chargeable with knowledge that defendants did not intend to offer a full and unqualified title, and we must accept the verdict of the jury as a settlement of this question against such knowledge on the part of plaintiffs. "The implication, when property is placed in the hands of a real estate broker for sale, is that the owner has a good title thereto, and that the purchaser can get the property unincumbered. When, therefore, a proposed purchaser agrees to buy, nothing being said about the title, he has the right to believe he will get a good title." Loan Co. v. Thompson, 86 Ala. 146, 5 South. Rep. 473. Roberts v. Kimmons, 65 Miss. 332, 3 South. Rep. 736, was an action by an agent to recover commission for the sale of land. The agent

made an agreement with the purchaser by which the purchaser was to take the same, "as soon as the title to him is made clear and satisfactory," and concerning this condition the court says: "The condition in the written contract, in regard to the title being made clear and satisfactory, was nothing more than the law and good faith implied, to-wit, that the purchaser should get a title free from valid objections." The undertaking of this contract added no obligation not imposed by law upon the seller. If defendants employed plaintiffs to find a purchaser for this property, the compensation was earned when they produced the purchaser upon the prescribed terms, and the inability of defendants to convey was an independent matter, for which they, and not plaintiffs, were responsible. The cases are uniform in this respect. Hamlin v. Schulte, 34 Minn. 534, 27 N. W. Rep. 301; Mooney v. Elder, 56 N. Y. 238; Hannon v. Moran, 71 Mich. 261, 38 N. W. Rep. 909.

If defendants were bound to make a good title to the property if sold, it would be an anomaly, both in law and reason, to hold, in the absence of controlling instruction or understanding between principal and agent, that the agent had violated his authority by providing that the purchaser should have such title. The test of plaintiffs' right to commission is not whether the contract in respect to this provision or any other is specifically enforceable between the principals, but whether the terms agreed upon were such as were authorized by defendants, or the plaintiffs had a right to understand were so authorized, either by their instructions or the conduct of defendants towards them. In respect to this provision, the case is not easily distinguishable from the not infrequent one of the inability of the husband to convey the entire title, on account of the refusal of the wife to join in the deed of real estate for which an agent had found a purchaser under employment of the husband. Such a case is Hamlin v. Schulte, *supra*, and the court, very properly, we think, says: "It must have been in the minds of the parties, principals and agents, and mutually understood, that the wife should join, and we think it is clear that the terms of their employment would be satisfied if they found a pur-

chaser ready and willing to purchase, not merely the terms agreed upon as to price and security, but also on condition that the wife should be bound by the contract. * * * If, then, the purchaser was procured upon terms in conformity with which the vendor assumed to be prepared to sell, and stipulated for by himself, he ought not to object, as against the claims of his agents, that he had not authority to make such terms." To the same effect is Clapp v. Hughes, 1 Phila. 382.

Lastly, defendants object to the terms of the contract because it provides that the purchaser may take immediate possession of a considerable part of the property; and this, to us, presents the most embarrassing question in the case. While it cannot be taken to modify the force of the objection, if substantial, it is noticeable that nowhere in defendant Wheeler's testimony, in which he refers to the conditions of the contract, objected to by him, is this feature alluded to as objectionable. Having already expressed the opinion that the scope and extent of plaintiffs authority must be gathered from the evidence, oral and written, concerning which, both as to expression and meaning, there is conflict, it was a question of fact for the jury, and not of law for the court, to determine what that authority was, and, under proper instructions, plaintiffs' powers under it. Rauber v. Sundback, (S. Dak.) 46 N. W. Rep. 927.

Was there any evidence in the case from which the jury might reasonably find in favor of plaintiff's authority to provide that the purchaser might go into possession? Mr. Bullock, the purchaser named in the contract, testifies (page 81, abstract) that in 1884 he had a conversation with defendant Goodkind, in Deadwood, in reference to purchasing this property, and, after an unsuccessful effort to that end, Mr. Goodkind told him that he was going away in a few days; that the matter would be left with McLaughlin & Steele, (these plaintiffs;) and that any arrangement he might make with them for the purchase of the property would be satisfactory to him; and that subsequently, in 1885, at Deadwood, he had a number of interviews with defendant Wheeler in regard to the purchase of the property, but, coming to no agreement, Wheeler told him, be-

fore he left, that the matter would be left with plaintiffs, who would have full power to act in the matter of sale. Benjamin Woelff testifies that defendant Wheeler told him, in 1885, that he was going to leave everything in the charge of McLaughlin & Steele, "to do whatever they saw fit,—something like that." While this evidence would not be very efficient to establish the general fact of plaintiffs' authority, yet, so far as Bullock is concerned, who was the alleged purchaser,—coming, as it did, directly from both defendants to him,—it may be doubted if it did not, as to him, constitute ostensible authority, beyond that covered by a mere employment to find a purchaser, or even to negotiate a sale, an authority which might fairly, as to him, include the disposition of this unused and inactive property during the negotiations of a pending sale; and while the ostensible authority of an agent, which will make his acts binding on his principal, is not necessarily the true measure of the authority as between the principal and the agent, yet we think the tendency of the testimony upon this point was to show defendants' understanding that they intended to and were conferring upon plaintiffs authority with respect to this property more ample than simply to find a purchaser therefor, and we cannot say that such inference by the jury would be so unjustifiable as not to be conclusive upon this court. Unless considered in connection with other subsequent instructions, such conclusion would be unwarrantable. The condition named in defendant's telegram of April 20th was, "transferred on last payment." If this expression, so used by defendants, was plain and certain as to its meaning, and incapable of but one interpretation, then it was the duty of the court to construe it, and instruct the jury as to plaintiffs' authority under it; but, if it was doubtful and reasonably susceptible of different interpretations, then it properly went to the jury, with all other evidence bearing upon plaintiffs' authority in the premises. By Section 3222, Comp. Laws, "transfer" is defined as the act by which the title to property is conveyed. Title and actual possession are frequently separated, and probably in a majority of cases of sale, when payments are deferred, the transfer of pos-

session precedes the transfer of title. If prior to this direction by telegraph defendants had instructed plaintiffs in regard to the possession of the property, pending the completion of a sale, we do not think this telegram would be understood by either party to affect such instruction. If this view of the effect of this telegram is a fair one, it follows that it was susceptible of more than one interpretation; in other words, that its meaning was ambiguous, and to be determined by the jury, aided by all the other testimony in the case. We think, too, the rule might be applied that, where doubt exists as to the import or meaning of an expression used by one party, upon the faith of which the other party has acted, that interpretation should be adopted which is most favorable to the latter. Noonan v. Bradley, 9 Wall. 407; Barney v. Newcomb, 9 Cush. 46; Hopwood v. Corbin, 63 Iowa, 218, 18 N. W. Rep. 911.

In the discussion of this case, although not examined *seriatim*, we think we have considered all the questions covered by appellants' assignments of error in giving and refusing instructions to the jury; and we conclude this opinion, of perhaps unjustifiable length, with the remark that we have endeavored carefully to examine and consider the effect of the evidence, both generally, and in connection with the points made and ably argued by both sides, and we are satisfied, both upon the law and the facts, that the judgment, upon the merits, should be affirmed. The order of the district court continuing the attachment in force is reversed. The judgment on the merits is affirmed. All the judges concurring.

Reporter: A rehearing was ordered in this case March 18th, 1891. Upon the rehearing the court adhered to the foregoing opinion so far as the same affirms the judgment of the lower court upon the merits, CORSON, Judge, dissenting, but modified it by reversing the order of the lower court refusing to discharge the attachment; all the judges concurring. (50 N. W. 834.)